UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :

               vs.          :          CRIMINAL NO.  3:03CR190 (JCH)

RICARDO ETIENNE          :          December 28, 2004

DEFENDANT'S SECOND SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS

_____The Defendant, Ricardo Etienne, respectfully submits this supplemental memorandum in response to questions raised during a hearing held in this case on December 21, 2004.

**I. Background.**

On December 21, 2004, the Court held a hearing in the above captioned case to determine whether Mr. Etienne could carry his burden of showing a "reasonable probability" that he would have obtained section 212(c) relief from deportation at his removal hearing held in 1999, had he been afforded the opportunity to request such relief.  See generally United States v. Copeland, 376 F.3d 61, 73 (2d Cir. 2004).  To carry this burden, Mr. Etienne testified, submitted affidavits from his attorney and his fiancee, and offered a Department of State Report on Human Rights Practices in Haiti, Mr. Etienne's Country of removal, all aimed at showing that he would have warranted section 212(c) at his deportation hearing.

In an effort to rebut Mr. Etienne's evidence, the government attempted to offer, over Mr. Etienne's objection, incident reports from three arrests, none of which resulted in prosecution for a crime.  After the hearing, the government also submitted the affidavit of John Marley, an assistant counsel with U. S. Immigration and Customs Enforcement (ICE).  Mr. Marley's affidavit states, among other things, that it is his practice during immigration hearings to question an alien about prior arrests regardless of whether they ultimately resulted in a conviction.  Mr. Marley also states that he routinely submits "police reports" as part of the government's case, again irrespective of the ultimate disposition of the matter addressed in the report.

At the close of the hearing, the Court requested additional briefing on the following issues: (1) The relevance of alleged prior bad acts/ arrests at a section 212(c) hearing; (2) Whether the

- 2 -

Court, in determining whether there is a "reasonable probability" that Mr. Etienne would have obtained section 212(c) relief, must view the evidence as it exists now or as it existed at the time of Mr. Etienne's deportation proceeding in 1999; and (3) The relevance of the State Department Report Mr. Etienne offered to show the hardship Mr. Etienne faced in Haiti.

**II. Discussion.**

> **a. The arrest reports the government submitted are irrelevant and should carry no weight with the Court.**

Despite the government's proffer at the hearing, and the assertions contained in Mr. Marley's affidavit, evidence of an alien's arrest, absent a subsequent conviction, carries little weight in determining whether the alien warrants section 212(c) relief. In Re Arreguin De Rodriguez, 21 I. & N. Dec. 38, 42 (BIA 1995); Billeke-Tolosa v. Ashcroft, 385 F.3d 708, 712-13 (6th Cir. 2004). The Board of Immigration Appeals (BIA) states that it is "hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein." Arreguin De Rodriguez, 21 I. & N. Dec at 42. In Arreguin De Rodriguez, the government introduced evidence at the alien's immigration hearing that she had previously been arrested on suspicion of smuggling aliens. Id. The alien was never prosecuted for this allegation, nor were deportation proceedings initiated. Id. At her hearing, the alien admitted she had been arrested, and provided legitimate explanations for the allegations contained in the report. Id. The immigration judge (IJ), however, concluded "that this incident was a negative factor to be considered in exercising [section 212(c)] discretion." Id. The IJ ultimately denied the alien's request for section 212(c) relief. Id. at 39.

On appeal, the BIA reversed the IJ's decision, and granted the alien section 212(c) relief. Id. at 43. Regarding the evidence of the alien's prior arrest, the BIA acknowledged that the alien "conceded that the arrest took place but admitted no wrongdoing." Id. at 42. In light of this evidence, as well as the fact that prosecution was declined and the lack of any corroboration to support the allegation contained in the report, the BIA was compelled to give the report "little weight." Id. The Sixth Circuit recently cited Arreguin De Rodriguez favorably, interpreting it as

- 3 -

"prohibiting consideration of unproven allegations that lack any other corroboration." <u>Billeke-Tolosa</u>, 385 F.3d at 712-13.

In Mr. Etienne's case, the Court, likewise, should not consider the arrest reports offered by the government. Like the report in <u>Arreguin De Rodriguez</u>, the reports in Mr. Etienne's case do nothing to suggest any wrongdoing on Mr. Etienne's part. More likely, given the heavy police presence in Mr. Etienne's neighborhood, the reports reflect over zealous police work. Significantly, none of the incidents addressed in the reports led to a prosecution much less a conviction, nor were immigration proceedings initiated based on any of the alleged incidents. Moreover, there is no evidence to corroborate the allegations contained in the reports. Instead, the evidence before the Court suggests just the opposite. For instance, Mr. Etienne explained that the allegation underlying his 1991 arrest for kidnapping and sexual assault were not pursued because it was discovered the complaining witness was lying. Additionally, he provided legitimate, non-rebutted explanations for his 1994 larceny arrest and his 1997 burglary arrest. Given this evidence, and the complete lack of any evidence corroborating the reports, it is most unlikely an IJ would give these reports any wight at an immigration proceeding based on the holding in <u>Arreguin De Rodriguez</u>. This Court, likewise, should give the reports no weight as well.

    **b. The Court must view the evidence as it existed at the time of Mr. Etienne's deportation proceeding in 1999.**

Mr. Etienne has found one case in the Second Circuit where a district court, faced with the identical issue as this Court, stated that it was proper to "consider the merits of [the defendant's] claim from the standpoint of an immigration judge at the time of [the defendant's] *original* deportation." <u>United States v. Figueroa-Taveras</u>, 228 F. Supp. 2d 428, 433 (S.D.N.Y. 2002) (emphasis added) *rev'd on other grounds* 69 Fed. Appx. 502 (2d Cir. 2003). Other decisions from both the Second Circuit as well as the BIA support this conclusion, although neither court has authoritatively stated as much. <u>Copeland</u>, 376 F.3d at 73; <u>In Re Farias-Mendoza</u>, 21 I. & N. Dec. 269, 274 (BIA 1996); <u>Matter of Gordon</u>, 20 I. & N. Dec. 52, 56 (BIA 1989). For example, in <u>Copeland</u>, the Second Circuit stated that the defendant's burden on this matter is to "show that he

- 4 -

likely would have been granted Section 212(c) relief if he had obtained a hearing." Copeland, 376 F.3d at 73. The thrust of this language suggests that a defendant must show that, had his deportation proceeding been conducted properly and he was afforded a section 212(c) hearing, he most likely would have warranted relief. In other words, the reviewing court is essentially going back in time to determine whether the defendant could have warranted relief had he been afforded a proper proceeding. Additional language in Copeland, that the defendant's "entire criminal record *at the time of his deportation* is relevant" to the determination of whether section 212(c) would have been available, also supports the conclusion that this Court should view the evidence as it existed at the time of the defendant's deportation proceeding. Id. at 74 (emphasis added).

Logically, this conclusion makes sense as well given what a defendant is essentially saying by challenging his deportation proceeding during a criminal prosecution under 8 U.S.C. § 1326. In making such an attack, a defendant is claiming that had he been afforded a properly conducted deportation proceeding he would not have been deported in the first place. Thus, it is appropriate to examine the facts as they existed at the time of his deportation to determine whether this allegation is in fact true. The Supreme Court has implicitly embraced the premise that a person should not be prosecuted for illegally reentering this Country after deportation if they never should have been forced to leave in the first place. See generally United States v. Mendoza-Lopez, 481 U.S. 828, 837-39 (1987). In that case, the Court held that a defendant must be able to challenge the validity of a prior deportation order if that order forms the basis for a subsequent prosecution under 8 U.S.C. § 1326. Id. Applying this premise in the context of Mr. Etienne's case, he claims that he should not have been deported because he would have warranted section 212(c) relief from deportation had he been properly afforded the opportunity to present such a case to the IJ. His complaint is that his deportation proceeding improperly denied him the opportunity to make such an application for relief. In light of Mendoza-Lopez and Copeland, this Court must now go back to the time of the error and determine whether a different outcome could possibly have resulted absent this error. Given this context, it only makes sense to view the evidence from the standpoint of the IJ at the time of the

- 5 -

erroneous immigration proceeding.

This conclusion is also consistent with language from the BIA discussing the proper approach in evaluating section 212(c) requests.  For example, when considering whether to grant section 212(c) relief, the BIA has instructed IJs to evaluate an alien's "circumstances *at the time of application for a waiver*" rather than at the time of the commission of the conduct forming the basis for deportation.  Farias-Mendoza, 21 I. & N. Dec. at 274 (emphasis added).  More importantly, an alien's subsequent criminal conduct cannot justify reversing an IJ's prior grant of section 212(c) relief.  Gordon, 20 I. & N. Dec. 52, 56.  If the government seeks to deport an individual based on new misconduct, it must initiate new deportation proceedings against that person.  Id.  In Gordon, an IJ granted an alien's request for section 212(c) relief, based in part, on evidence of the alien's rehabilitation.  Id. at 53.  Eight months later, the alien was convicted of first degree assault and sentenced to five years' imprisonment.  Id. at 53-54.  Based on this conviction, the government moved to reopen the alien's immigration proceeding, and requested the IJ revoke his earlier grant of section 212(c) relief.  Id. 54.  In the government's opinion, this subsequent conviction was clear evidence of the alien's "lack of rehabilitation."  Id.  The IJ granted the government's request, reopened the proceedings, concluded that section 212(c) relief was not warranted, and ordered the alien deported.  Id.

The BIA reversed this decision, finding that a grant of section 212(c) relief is final and restores the alien to the status of lawful residency.  Id. at 56.  "Any subsequent criminal or immigration violations must be addressed *within the context of new deportation proceedings* pursuant to a new Order to Show Cause."  Id. (emphasis added).  Applying this precedent to Mr. Etienne's case, had the IJ properly granted Mr. Etienne section 212(c) relief in the first place, the government could not have the IJ reconsider this decision at a later date based on any subsequent evidence in favor of deportation.  Instead, it would have been required to initiate entirely new proceedings against Mr. Etienne.  Thus, the government should, likewise, be prevented from using any evidence at this proceeding that would not have been available at the time of Mr. Etienne's

- 6 -

original deportation proceeding.

Finally, equitable considerations compel viewing the evidence as it existed at the time of Mr. Etienne's deportation proceeding as well.  This is because it is impossible to say whether a particular "negative factor," say family circumstances for instance, that may exist now is legitimately present now or simply the unfortunate and unintended result of the stressful circumstances associated with Mr. Etienne's improper deportation.  If the latter is true, it would be unfair to say that Mr. Etienne's family circumstances would not have justified section 212(c) relief in 1999, when such negative circumstances did not exist in 1999, and only came about as a result of his improper deportation in the first place.[1]

Thus, in light of the aforementioned arguments, it is proper for the Court, in determining Mr. Etienne's eligibility for Section 212(c) relief, to view the evidence as it existed at the time of his deportation proceeding.[2]

**c.  It is proper for the Court to consider the State Department Report on Human Rights Practices in Haiti, which Mr. Etienne submitted in an effort demonstrate "hardship" under a section 212(c) analysis.**

In determining whether a "reasonable probability" exists that Mr. Etienne would have obtained section 212(c) relief had the opportunity been afforded to him, this Court must balance competing favorable and adverse factors.  Copeland, 376 F.3d at 74.  One of these factors is "evidence of hardship to the alien and the alien's family upon deportation."  Id.  In an effort to show hardship, and keeping in mind that evidence of incidents that occurred *after* the deportation is not proper, Mr. Etienne has offered the Department of State's "Haiti Country Report on Human Rights Practices for 1998," the most recent report that would have been available at the time of Mr.

---

[1]  It is important to note that Mr. Etienne uses the example of negative family circumstances only to illustrate his point, and in no way concedes the actual existence of negative family circumstances at the present time.

[2]  It is also important to note that courts have routinely held that ambiguities in immigration statutes and procedures are resolved in favor of the alien.  Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948); Evangelista v. Ashcroft, 359 F.3d 145, 151 (2d Cir 2004).

- 7 -

Etienne's deportation hearing.  Mr. Etienne submitted this report in an effort to show the hardship conditions that existed in Haiti in 1998-99.  The Court requested briefing on the propriety and relevance of such information at a typical section 212(c) hearing.  While Mr. Etienne has been unable to find a BIA decision specifically addressing the consideration of such a report in the context of a section 212(c) request, other decisions from the BIA discussing evidence of "hardship" in a particular case demonstrates that evidence such as the report in question is relevant and proper.

For example, in In Re Mendez-Morales, 21 I. & N. Dec. 296 (BIA 1996), the alien sought relief from deportation pursuant to section 212(h) of the Immigration and Nationality Act, a section akin to section 212(c).  Id. at 298.[3]  In determining whether to grant section 212(h) relief, the IJ balanced the same factors relevant to section 212(c) relief, including any hardship to the alien and his family upon deportation.  Id. at 301.  Both the IJ and the BIA found that the alien established a hardship to his family if he were deported.  Relevant for this discussion, however, the BIA also found that the alien demonstrated some hardship to himself as well given the poor economic conditions in Mexico, the country of destination.  Id. at 303.  Notably, the alien demonstrated these conditions through news articles submitted during his hearing.  Id.  In light of this language, the fact that conditions in an alien's country of destination would cause a hardship to the alien is indeed relevant and proper evidence for consideration in determining whether discretionary relief is warranted.

Likewise, the dissenting opinion in In Re Chih Kao, 23 I. & N. Dec. 45 (BIA 2001), suggests that the precise type of report Mr. Etienne offered in this case is relevant in determining whether conditions in the country of destination would result in hardship to an alien or his family upon deportation.  Id. at 54 (Jones, dissenting) (discussing, in the context of proof of hardship to the alien, evidence of economic conditions contained in the Department of State's Country Reports on Human Rights Practices for the Country of Taiwan).  Finally, in In Re O-J-O-, 21 I. & N. Dec. 381 (BIA 1996), the BIA relied on evidence contained in a report similar to the one Mr. Etienne has offered to

---

[3]  Like section 212(c), section 212(h) permits discretionary relief from deportation for aliens convicted of certain criminal offenses.  8 U.S.C. § 1182(h)(1)(B).

- 8 -

find that the alien in that case demonstrated "extreme hardship," justifying discretionary suspension of deportation. Id. at 385. In that case the alien sought discretionary relief from deportation pursuant section 244(a) of the Immigration and Nationality Act. Id. at 382. Such relief is similar to section 212(c) in the sense that it is exercised in the IJ's discretion, and that hardship to the alien is relevant to the decision to exercise this discretion. Id. at 382-83. In determining whether a hardship would exist, the IJ in that case was bound to consider the "conditions in the country to which the alien is returnable - economic and political." Id. at 383. In finding that the alien had demonstrated hardship, the BIA discussed in detail the political and economic conditions that existed in the country of destination. Id. at 385-86. This evidence came from a Department of State Report on "Country Conditions." Id. at 385. This report is very similar to the one Mr. Etienne offered in this case.

The foregoing cases support the conclusion that, when hardship to the alien is a consideration in determining whether to grant relief from deportation, the economic and political conditions in the country of destination are relevant. Moreover, evidence of such conditions typically can come from State Department reports discussing such conditions. Given that hardship to Mr. Etienne is a factor the IJ in his case would have considered in determining whether to grant section 212(c) relief, it would have been appropriate, in light of the aforementioned cases, for the IJ to have considered the type of economic, political, and social conditions Mr. Etienne faced in Haiti if he were deported. It would have also been appropriate for Mr. Etienne to have introduced this evidence via the report in question. Given that such evidence would have been admissible and relevant at Mr. Etienne's section 212(c) hearing in 1999, were he afforded one, it is also appropriate for this Court to consider the evidence in the present setting as well.

**d. Mr. Etienne has demonstrated a "reasonable probability" that he would have obtained section 212(c) relief during his deportation proceeding were he afforded the opportunity to make such a case.**

As mentioned in previous filings, in order to determine whether Mr. Etienne has made the requisite showing that he would have been entitled to section 212(c) relief, this Court must balance a number of competing factors. Copeland, 376 F.3d at 74. The negative factors favoring deportation

- 9 -

include: 1) the nature and circumstances of the exclusion ground; 2) the presence of additional immigration law violations; 3) the existence of a criminal record and its nature, recency and seriousness; and 4) the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident.  Id.  Favorable factors supporting relief from deportation include: 1) family ties within this country; 2) residence of long duration in this country (especially arrival at an early age); 3) evidence of hardship to the alien and the alien's family upon deportation; 4) Armed Forces service; 5) a steady employment history; 6) community service; 7) property or business ties; 8) evidence attesting to good character; and 9) proof of genuine rehabilitation.  Id.  No one factor is dispositive, instead the exercise of discretion requires consideration of all the relevant facts and circumstances involved.  Matter of Coelho, 20 I. & N. Dec. 464, 467 (BIA 1992). Moreover, the absence of one or more favorable factors does not convert such factors into adverse considerations.  Arreguin De Rodriguez, 21 I. & N. Dec. at 41.

Examining these factors in Mr. Etienne's case, he first notes that he need not make the same exact showing in terms of substance that he would have made at an actual section 212(c) hearing, nor must this Court find that section 212(c) relief would have *actually* been granted.  Instead, Mr. Etienne need only present evidence sufficient for this Court to conclude that section 212(c) relief *probably* would have been granted.  In making this determination, the Court may properly rely on testimony, affidavits, and any other documentation it deems relevant and reliable, just as an IJ could rely on such evidence at an actual section 212(c) hearing.  See Matter of Edwards, 20 I. & N. Dec. 191, 193 (BIA 1990); Matter of Marin, 16 I. & N. Dec. 581, 586 (BIA 1978).

Looking at the adverse factors in this case, Mr. Etienne acknowledges that his drug-related convictions in 1995 and 1997 are significant.  However, this twenty-four month period in the span of nearly twenty years as a lawful permanent resident is truly Mr. Etienne's only evidence of undesirability. Copeland, 376 F.3d at 74.  For instance, there are no allegations of any violations of immigration laws other than the one that formed the basis for his deportation in 1999.  Id.  Nor is there any evidence that Mr. Etienne has exhibited any violent or abusive behavior.  Finally, as

- 10 -

discussed in greater detail below, there is substantial evidence that Mr. Etienne rehabilitated himself after his incarceration in 1997, thus effectively mitigating his initial evidence of undesirability.

In contrast, there exists several favorable factors in support of section 212(c) relief, all of which are significant to the section 212(c) determination. These include Mr. Etienne's long duration in this Country, his arrival at an early age, his family ties here in Connecticut, and the hardship his deportation would cause both him and his family. Id. As mentioned previously, Mr. Etienne first came to this Country in 1980 at the age of six. Although he initially split his time between the United States and Haiti from 1980 to 1985, by 1985, at the age of eleven, he was living permanently in this Country with his mother and brother. Mr. Etienne completed middle school and high school in this Country, and even began taking college classes. He also demonstrated a fairly consistent work history, maintaining various jobs from 1991 to 1997.

As for family ties, Mr. Etienne's fiancee, Marjorie Roc, and the couple's three children all reside in the United States (at the time of Mr. Etienne's deportation hearing he only had two children). As Ms. Roc's affidavit states, she and Mr. Etienne had lived together since 1994, and Mr. Etienne supported the family financially and emotionally during that time. With Mr. Etienne's income, the family was able to afford reasonable living arrangements. When he was not working, he would babysit the children so that Mr. Roc could work and take classes to further her employment prospects. Moreover, Mr. Etienne was a "great" father who was adored by his children, and was a loving fiance. By all accounts, prior to his deportation, Mr. Etienne enjoyed a very loving and close relationship with his fiancee and children. This fact remained true even despite his incarceration at the time of his deportation. During Mr. Etienne's incarceration, Ms. Roc would bring their children to visit Mr. Etienne whenever possible. Indeed, conclusive evidence of Ms. Roc's desire to maintain her relationship with Mr. Etienne, and to keep him in this Country were her efforts to retain an attorney to represent Mr. Etienne at his deportation hearing.

Mr. Etienne's family ties in this Country at the time of his deportation also extended to his mother and brother as well. Evidence presented demonstrates that Mr. Etienne remained very close

- 11 -

to his brother and mother, attending catholic church with them when he could.  No doubt, the extent of his mother's emotional attachment is evident from the heartache she felt when Mr. Etienne was incarcerated.  Despite her inability to bring herself to visit him in person while in prison, Mr. Etienne's mother continually contacted him during his incarceration, and also assisted in retaining counsel for his immigration proceeding.  This fact demonstrated his mother's desire as well to keep Mr. Etienne in this Country.

Finally, with regards to hardship, it is apparent, and should have been apparent at the time of his deportation proceeding, that Mr. Etienne's deportation presented substantial hardship to both himself and his family.  As the Department of State's report demonstrates, economic conditions in Haiti were and are deplorable, and presented Mr. Etienne with no real opportunity for sustainable employment.  This would have made it unrealistic for Mr. Etienne to sustain himself, let alone a family were his fianceé and their children to decide to relocate to Haiti to be with him.  Moreover, social conditions, particularly rampant crime, were and are a major concern.  This, too, would create an adverse circumstance were Mr. Etienne's family to join him in Haiti.

Aside from hardship posed to Mr. Etienne and his family in Haiti, it was apparent that his family would have and did suffer severe hardship as a result of his deportation.  First, Ms. Roc states that she and the children were forced to move into a much smaller apartment in a heavier crime area as a result of Mr. Etienne's deportation.  They also experienced a significant change in lifestyle, and suffered the loss of Mr. Etienne's companionship.  This was particularly hard for Mr. Etienne's oldest child, Rickya.  Moreover, the cost of travel made it virtually impossible for Ms. Roc and the children to visit Mr. Etienne.  No doubt, this prospect of not seeing his family played a motivating role in Mr. Etienne's decision to return to this Country.

In sum, Mr. Etienne's arrival in this Country at a young age, his long time residence, his significant connection to and involvement in his children's lives, his permanent relationship with his fiancee, and the hardship conditions he and his family faced upon deportation significantly outweigh any evidence of undesirability, and would have favored the grant of section 212(c) relief, were he

- 12 -

afforded the opportunity to present such a case at his deportation hearing.  It is also important that section 212(c) relief was granted in a "very 'substantial percentage'" of cases.  <u>Copeland</u>, 376 F.3d at 73 <i>quoting</i> <u>I.N.S. v. St. Cyr</u>, 533 U.S. 289, 296 (2001).  This was particularly true in Connecticut where "well over one-half" of the applications for section 212(c) were granted.  <u>See</u> Exhibit D at 3 (Affidavit of Attorney Robert Maresca).  Given all this, it is reasonably probable that Mr. Etienne would have obtained section 212(c) relief were he given the chance.

In an effort to show otherwise, the government has claimed, given Mr. Etienne's drug convictions, that he must demonstrate "unusual or outstanding equities" to warrant relief.  <u>Matter of Buscemi</u>, 19 I. & N. Dec. 628, 633 (BIA 1988).  While it is true that such a heightened showing is required when an alien has been convicted of a serious drug offense, the requirement "is not exclusively triggered by serious crimes involving controlled substances."  <u>Id.</u>  Instead, "one must examine the gravity of the offense, per se."  <u>Id.</u>  Assuming <i>arguendo</i> that Mr. Etienne's case mandates the showing of "unusual or outstanding equities," he meets this burden.

BIA cases addressing this requirement have found that an alien's long term residence in this Country and/ or family ties usually constitutes "unusual or outstanding equities."  <u>Arreguin De Rodriguez</u>, 21 I. & N. Dec. at 41; <u>Coelho</u>, 20 I. & N. Dec. at 468-69; <u>Matter of Edwards</u>, 20 I. & N. Dec. 191, 197 (BIA 1990);  <u>Buscemi</u>, 19 I. & N. Dec. at 634.  In <u>Arreguin De Rodriguez</u>, for example, the BIA found outstanding equities based on the alien's residence of nearly twenty years, the residence of her minor children ages eleven and three in this Country, and her family ties.  <u>Arreguin De Rodriguez</u>, 21 I. & N. Dec. at 41.[4]  This was true despite the alien's federal conviction for importing more than seventy-eight kilograms of marijuana into this Country.  <u>Id.</u> at 39.

Likewise, in <u>Coelho</u>, the BIA found outstanding or unusual equities based on the alien's twenty-three years of residency beginning at age thirteen, his familial ties to this Country including his support of his two minor children, and the fact that a majority of his family also resided in the

---

[4]  The BIA also found persuasive the great financial strain placed on the individuals who were to care for the alien's children if she were deported.  <u>Id.</u> at 41.

- 13 -

United States. <u>Coelho</u>, 20 I. & N. Dec. at 468-69. The BIA made this finding despite the alien's federal conviction for conspiring to distribute two pounds of cocaine for which he expected to reap $50,000. <u>Id.</u> at 465, 469. Even in <u>Buscemi</u>, the case the government repeatedly referenced in an effort to suggest that Mr. Etienne did not warrant relief, the BIA found outstanding equities based on the alien's long time residence, his close familial ties, and the apparent hardship his deportation would cause his family. <u>Buscemi</u>, 19 I. & N. Dec. at 634. The BIA found particularly compelling in this case the alien's seventeen years of residence in this Country since age nine. <u>Id.</u>

Based on the aforementioned cases, it is evident that Mr. Etienne can show outstanding equities as well. Mr. Etienne came to this Country in 1980 at age six, and resided permanently here since 1985 at age eleven. Thus, at the time of his deportation, he had nearly twenty years of residency, approximately fifteen of which had been continual. Moreover, most of Mr. Etienne's family resided in the United States, including his mother, brother, fiancee, and children (who were U. S. citizens). The record also demonstrates that Mr. Etienne enjoyed a very close relationship with his family, living more than five years with his fiancee and children, and providing financial and emotional support. Finally, the record establishes the significant hardship Mr. Etienne's deportation posed for both he and his family, especially his minor children. Based on all this, and in light of the BIA's decisions on this issue, Mr. Etienne can demonstrate unusual and outstanding equities were this required at a section 212(c) hearing.

The government also claims that, in addition to showing outstanding equities, Mr. Etienne's criminal record requires him to demonstrate genuine rehabilitation before the Court may consider whether he could have obtained favorable relief. <u>See Buscemi</u>, 19 I. & N. Dec. at 635. While it is true that an alien with a criminal record "ordinarily" must demonstrate rehabilitation to warrant section 212(c) relief, this factor, contrary to the government's assertions, "is not an absolute prerequisite." <u>Arreguin De Rodriguez</u>, 21 I. & N. Dec. at 40. Instead, rehabilitation is simply one factor to consider along with all the other factors relevant to the determination of section 212(c) relief. <u>Id.</u> Moreover, the BIA has recognized the difficulty incarcerated aliens, such as Mr. Etienne

- 14 -

was at the time of his deportation hearing, face "in demonstrating convincing efforts towards rehabilitation." Id. Given this, the BIA has stated that "any efforts [at rehabilitation] will be considered, and the applicant is not barred automatically from discretionary relief by her incarceration." Id.

In Arreguin De Rodriguez, for example, the BIA found as evidence of the alien's efforts at rehabilitation her acceptance of responsibility for her crime and sincere remorse for her behavior. Id. Moreover, the BIA found persuasive the alien's efforts while incarcerated to better herself. Id. This included her voluntarily pursuing her GED as well as other courses, the absence of any infractions, and her involvement in church ministry. Id. Ultimately, the BIA found evidence of rehabilitation and granted the alien section 212(c) relief. Id. at 43.

By way of contrast, the BIA has found a lack of rehabilitation primarily where the alien's criminal history spans many years or where the alien's demeanor suggests that he has not fully accepted responsibility for his behavior. For example in Edwards, 20 I. & N. Dec. at 198, the BIA found a lack of rehabilitation based primarily on the alien's record of offenses spanning ten years, and his continued inability to refrain from drug use. Id. Likewise, in Matter of Roberts, 20 I. & N. Dec. 294, 302-03, the BIA found a lack of rehabilitation where the alien appeared more intent on showing how he was "set up" for his crime than in expressing remorse for his actions, and particularly where there was a lack of any evidence that he participated in or desired drug counseling. Id. Finally, in Buscemi, the BIA found no evidence of rehabilitation where the alien continued to commit crimes after attending a drug treatment program, and where the alien gave inconsistent statements regarding his drug habit. Buscemi, 19 I. & N. Dec. at 635.

Examining the facts of Mr. Etienne's case, it is evident that he is much more akin to the alien in Arreguin De Rodriguez than the aliens in the cases where the BIA found no evidence of rehabilitation. Foremost, Mr. Etienne testified under oath and accepted full responsibility for the conduct underlying his criminal convictions. Mr. Etienne pled guilty to these offenses, and showed remorse for his misconduct. More importantly, similar to the alien in Arreguin De Rodriguez, Mr.

- 15 -

Etienne has made a strong showing of rehabilitation despite his incarceration prior to his deportation. He voluntarily participated in and completed TIER I, II, and III drug treatment counseling, took educational courses that would have improved his employment prospects upon release, continued with his participation in church activities, and did not receive any infractions.[5]  Finally, it is important to note that his convictions involved relatively minor amounts of drugs, in one instance only 1.9 grams of crack cocaine, and in another only 0.13 grams of crack cocaine.  See Exhibit G (attached to this memorandum).[6]  This is a far cry from the seventy-eight kilograms of marijuana the alien in Arreguin De Rodriguez smuggled into the Country, and she still warranted section 212(c) relief.  In light of all this, Mr. Etienne could have made a strong showing of rehabilitation were he afforded the opportunity during his deportation proceeding.

**III. Conclusion.**

_____It goes without saying that courts view deportation, although civil in nature, as a drastic and punitive consequence.  Fong Haw Tan, 333 U.S. at 10.  It often is the equivalent of banishment or exile for the alien, and is meant to be avoided whenever possible as an alternative of last report.  Id.; Figueroa-Taveras, 228 F. Supp. 2d at 435-36.  As such, courts must carefully review the facts in any case where deportation can result, and generally resolve doubts concerning application of a particular statute or regulation in favor of the alien.  Id.; Evangelista, 359 F.3d at 151.  In light of this view of deportation proceedings, the facts of Mr. Etienne's case demonstrate that he would have made a compelling argument for relief from deportation were he afforded this opportunity in 1999.

A review of the relevant cases highlights that Mr. Etienne exhibits most if not all of the elements that favor relief from deportation, and possesses little if any elements of undesirability.  This

---

[5]  For the Court's convenience Mr. Etienne has attached as an exhibit the Connecticut Department of Corrections description of the TIER counseling programs, which document the intensive, structured requirements necessary to complete such programs.  See Exhibit F.

[6]  Mr. Etienne notes that one of the lab reports contained in Exhibit G references the name Lorraine Vigliotti.  It is understood that Ms. Vigiotti was observed receiving the drugs in question from Mr. Etienne.

- 16 -

is particularly true given Mr. Etienne's significant efforts at rehabilitation. Indeed, Mr. Etienne is a far cry from the alien in <u>Figueroa-Taveras</u>, whose criminal record and periods of incarceration spanned thirteen years, and whose case for section 212(c) relief the Second Circuit still categorized as a "close call." <u>Figueroa-Taveras</u>, 69 Fed. Appx. at 503. Instead, Mr. Etienne is more like the alien in <u>Arreguin De Rodriguez</u> or the defendant in <u>United States v. Perez</u>, 330 F.3d 97, 102 (2d Cir. 2003) (holding that despite his conviction for the attempted sale of drugs, the defendant could have made a strong showing for section 212(c) relief where he had a history of employment, a wife who was a permanent resident, and a son who was a United States citizen). Mr. Etienne has sincerely accepted responsibility for his misconduct, expressed remorse, and made exceptional efforts to rehabilitate himself while incarcerated. Moreover, he has unusually strong ties to this Country, given his long residence here from an early age, and enjoys close familial relationships with his mother, fiancee, and children. Finally, there is no doubt that his deportation poses an immeasurable hardship for both Mr. Etienne and his family.

In light of all this, it is "reasonably probable" that Mr. Etienne would have warranted section 212(c) at the time of his deportation proceeding. Thus, he has carried his burden under 8 U.S.C. § 1326(d), and successfully demonstrated the fundamental unfairness of his deportation proceeding. As such, the government is prohibited from using the deportation order issued as a result of this proceeding as evidence in the current prosecution. Without this evidence, the government cannot establish a necessary element of the charged offense. Thus, a dismissal of the charge is warranted. <u>See</u> <u>United States v. Calderon</u>, ___ F.3d ___, 2004 WL 2728580, at *5 (2d Cir. Dec. 1, 2004).

Respectfully submitted,

THE DEFENDANT,
RICARDO ETIENNE

THOMAS G. DENNIS
FEDERAL DEFENDER

/s/

_____
Thomas P. Belsky

Dated:  December 28, 2004

- 17 -

Asst. Federal Defender
2 Whitney Ave., Suite 300
New Haven, CT 06510
Bar No. ct24770
(203) 498-4200

<u>CERTIFICATION</u>

    I HEREBY CERTIFY that a copy of the foregoing has been mailed to Krishna Patel, Assistant United States Attorney, P.O. Box 1824, New Haven, CT 06508, on this 28th day of December 2004.

/s/
_____
Thomas P. Belsky